1
2
3
4
5
6
7
8          IN THE UNITED STATES DISTRICT COURT

9          FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   GUILLERMO PADILLA VENEGAS,              No C 05-5135 VRW (PR)
     aka Marcos Ranjel,
12
                    Petitioner,             ORDER DENYING PETITION FOR A
13                                          WRIT OF HABEAS CORPUS
              v
14
     D L RUNNELS, Warden,
15
                    Respondent.
16
     _____/
17

18
              Before the court is petitioner Guillermo Venegas' petition
19
     for a writ of habeas corpus under 28 USC § 2254.  For the reasons
20
     that follow, the petition is denied.
21

22
                                  I
23
              On April 1, 1999, a grand jury indicted petitioner and
24
     Robert Sanger, whose trial was later severed, charging them with the
25
     murder of Carmel Sanger with the special circumstances that the
26
     murder was committed for financial gain and that petitioner used a
27
     firearm in commission of the murder.  The indictment also charged
28

1   petitioner with the unlawful possession of a firearm by a felon.

2       On April 11, 2001, a jury in the Superior Court of the
3   State of California in and for the County of San Francisco found
4   petitioner guilty as charged and found the special allegations true.
5   On April 26, 2001, the trial court (Kevin Ryan, J) sentenced
6   petitioner to life without the possibility of parole on the murder
7   charge, with an additional determinate term of four years for his
8   use of a firearm.  The court stayed petitioner's sentence for the
9   unlawful possession of a firearm.

10      On August 22, 2003, the California Court of Appeal
11  affirmed the judgment of the trial court and, on November 25, 2003,
12  the Supreme Court of California denied review.

13      On November 10, 2004, petitioner filed a petition for a
14  writ of habeas corpus in the California Court of Appeal, which the
15  court summarily denied on November 18, 2004.

16      On October 12, 2005, the Supreme Court of California
17  denied petitioner's final petition for state habeas relief.

18      On December 12, 2005, petitioner filed the instant federal
19  petition for a writ of habeas corpus under 28 USC § 2254.  The court
20  found that it stated cognizable claims for relief, when liberally
21  construed, and ordered respondent to show why a writ of habeas
22  corpus should not be granted.  Respondent has filed an answer.

23

24                                  II

25      The California Court of Appeal summarized the factual
26  background of the case as follows:

27

28                                  2

At trial, the following evidence was adduced. The victim, Carmel Sanger, owned a hair salon in San Francisco called the Pink Tarantula. She and her ex-husband, codefendant Robert Sanger (aka Skull), lived above the salon until their separation in April of 1996; their marriage was dissolved later that year. Robert Sanger was the beneficiary of two life insurance policies on the victim, one for $350,000 and the other for $400,000. In late 1996, Robert Sanger described the victim as a "fucking bitch," and indicated that she had ruined his life. He was in a rage because she had been seeing someone else and said, "I will kill her." Robert Sanger frequently expressed similar feelings of hatred toward the victim to Selina Archuletta and offered Archuletta money to kill the victim.

Robert Sanger began living with a woman named Tiffany Wallace after the divorce; they later married. She was a heroin addict, and when interviewed by the police in January of 1998, she was in custody. She indicated that the police offered to help her get released if she provided information to incriminate Robert Sanger.

On March 5, 1997, at 5:30 p.m., Carmel Sanger was working at the Pink Tarantula salon, along with three other hairdressers. A man whose eyebrows appeared "plucked" or "shaved," like those of "a transsexual or transvestite" entered the salon. Elizabeth Pfau asked if she could help him. He asked to see Carmel Sanger, who left her client and approached the man to talk to him about scheduling an appointment. The man produced a gun and shot her in the head. He then fled, firing another shot as he left the salon. Pfau called 911 as people in the salon screamed and took cover. Nothing was taken from the salon. Carmel Sanger died from a single gunshot wound to the head, having been fatally shot through the eye.

Several witnesses outside the salon witnessed the shooter either before or after the shooting. Although their accounts varied in details, they generally agreed that they saw a man go into the salon from a car parked nearby, and that a woman (described as having blonde or bleached-blonde hair) remained in the automobile. After the shooting, the man returned to the vehicle and it drove away.

3

Witnesses' descriptions of the getaway car and a partial license plate number led to the identification of a Chevrolet Malibu purchased by one Amber Tyler and a man in February of 1997.  The individual who sold them the car, Tony Williams, went to their apartment on Pine Street in San Francisco to deliver the bill of sale.  The woman was described as a bleached blonde.  The car was cited for parking violations seven times in February and March 1997, including six times near the corner of Mason and Pine Streets.  The clerk at a nearby store recognized defendant and Tyler as customers who drove a car with a description similar to that of the getaway car (and the vehicle sold by Tony Williams).  The crime scene witnesses looked at Tyler's vehicle and said it resembled the getaway car or was similar to it.

Bullets and casings were found inside the Pink Tarantula; the bullets were later matched with a nine-millimeter semiautomatic handgun found in the street about two blocks away from the salon.  The gun was registered to Tannie Tomlin, a correctional officer at the county jail in Seattle, Washington.  A link was established between Tomlin and the defendant, as defendant was an inmate in the part of the jail where Tomlin worked, in 1992 and 1993.  Additionally, six calls were made from Tomlin's phones to defendant and Tyler in June and December of 1996 and January of 1997, and 41 calls were made to Tomlin's phones from defendant and Tyler's residence from January 1996 to April 1997.  Tomlin purchased a one-way plane ticket for a November 26, 1996 flight from Seattle to Oakland.

Pfau was shown a photographic lineup containing defendant's photograph and indicated that the shooter was one of two people depicted in it (one of whom was defendant).  She positively identified defendant as the shooter later in court.  Carmel Sanger's client, who witnessed the shooting, was also shown a photographic lineup and narrowed her choice to two people, one of whom was defendant.

When initially interviewed by the police in March of 1997, defendant indicated that he used cocaine and heroin with Robert Sanger and that Robert Sanger had unsuccessfully tried to get him to work for him selling drugs.  He claimed

4

to have sold the Chevrolet Malibu to a Victor Peña two months earlier.  Even though the police ultimately informed defendant during this interview that eyewitnesses had identified him as the shooter, defendant consistently denied killing Carmel Sanger.

The day after this interview, defendant and Amber Tyler left the area, and Tyler told a friend he could sell their possessions to earn money.  Arrest warrants were issued for defendant and Tyler on April 3, 1997.  An acquaintance of defendant, Sarah Claxton, indicated that she encountered defendant and Tyler in San Francisco several months after Carmel Sanger had been killed.  They had traveled to Mexico, but had returned to San Francisco to collect the $20,000 that Robert Sanger was to pay defendant for killing Carmel Sanger.  When defendant called Robert Sanger, Robert Sanger promised to pay him $1,300, but defendant received only $1,100 or $1,200. Defendant and Tyler, who were using heroin, left town shortly thereafter.  Claxton thought they may have gone to Seattle, because someone named "Tiny" owed defendant money.

Defendant was arrested, along with Amber Tyler, at a Seattle hotel in December of 1997. He at first denied being Marcos Ranjel and identified himself as Guillermo Padilla.  After Tyler correctly identified herself and defendant, he admitted his true identity. During an interview by the FBI, defendant indicated that he changed his name from Guillermo Padilla to Marcos Ranjel when he moved to the United States from Mexico.  He admitted using cocaine and heroin with Robert Sanger in San Francisco.  Although Robert Sanger offered him $100,000 to kill Carmel Sanger, defendant declined the offer.  Later, when defendant and Robert Sanger were using crystal methamphetamine together, Robert Sanger persisted in trying to hire defendant to kill his ex-wife.  Defendant explained that he was selling some real property valued at $800,000 and did not want to share the proceeds with Carmel Sanger.  Robert Sanger showed defendant a gun that could be used, and indicated that his girlfriend would help defendant accomplish the killing.  When asked directly if he killed Carmel Sanger, defendant replied, " 'Maybe I did, maybe I didn't.' " He indicated that he and Tyler went to Mexico City

5

after his first interrogation.  When they
returned to San Francisco in August of 1997,
they learned the police were looking for them
and they fled to Seattle.

After the FBI informed defendant that they
had eyewitnesses who had identified him as the
shooter, defendant indicated that he would tell
"what really happened."  He confessed that he
shot and killed Carmel Sanger in the Pink
Tarantula salon, that he ran out into the street
and fired another shot into the salon, and that
Robert Sanger's girlfriend drove the getaway
car, a black Chevrolet.  They had smoked crystal
methamphetamine just prior to the shooting.
Robert Sanger never paid him any money and he
never saw Robert Sanger or his girlfriend again.

Defendant was later interviewed by San
Francisco homicide investigators.  He reiterated
an account of the shooting similar to that which
he had given to the FBI, with some additional
details.  He indicated that Robert Sanger had
told him that Carmel Sanger had hired someone to
kill Robert Sanger, so Robert Sanger wanted to
kill her first.  On the day of the shooting,
Tiffany Wallace offered to help defendant kill
Carmel Sanger and drove him to Carmel Sanger's
hair salon in defendant's car.  They ate in a
restaurant and then smoked drugs in defendant's
car.  Defendant told Wallace that he did not
want to shoot Carmel Sanger, but he took the gun
that she provided and did so.  He claimed to be
very high on drugs.  They disposed of the gun as
they drove away from the scene.  Defendant
admitted that the gun he used was a nine-
millimeter that he sold to Robert Sanger after
purchasing it from Tannie Tomlin.

During a subsequent interview in San
Francisco, defendant told the police that he
killed Carmel Sanger because Robert Sanger
offered to pay him $100,000 that Robert Sanger
expected to get from the sale of a building.
Tiffany Wallace urged him to kill Carmel Sanger
quickly.  Defendant reiterated that he killed
Carmel Sanger the next day with a gun that he
purchased from Tomlin and sold to Robert Sanger.
Tyler drove him to the salon, but he told her
only that he was going there to purchase drugs.
He said that after he and Tyler ate in a
restaurant, he went into the Pink Tarantula and
shot Carmel Sanger; he fired one more shot as he

6

1
2
3
4

> left the salon.  He then got into the car and
> Tyler drove away.  He disposed of the gun as
> they drove to Tyler's mother's home.  When
> defendant returned from Mexico months later, he
> called Robert Sanger and asked for payment; his
> friend Hutton collected $1,500 from Robert
> Sanger for him.

5  <u>People v Ranjel</u>, No A094861, slip op at 2-7 (Cal Ct App Aug 22,

6  2003) (footnotes omitted) (Resp't Ex 6).

7

8                                III

9       A federal writ of habeas corpus may not be granted with

10  respect to any claim that was adjudicated on the merits in state

11  court unless the state court's adjudication of the claim:  "(1)

12  resulted in a decision that was contrary to, or involved an

13  unreasonable application of, clearly established Federal law, as

14  determined by the Supreme Court of the United States; or (2)

15  resulted in a decision that was based on an unreasonable

16  determination of the facts in light of the evidence presented in the

17  State court proceeding."  28 USC § 2254(d).

18       "Under the 'contrary to' clause, a federal habeas court

19  may grant the writ if the state court arrives at a conclusion

20  opposite to that reached by [the Supreme] Court on a question of law

21  or if the state court decides a case differently than [the] Court

22  has on a set of materially indistinguishable facts."  <u>Williams v</u>

23  <u>Taylor</u>, 529 US 362, 412-13 (2000).  "Under the 'unreasonable

24  application' clause, a federal habeas court may grant the writ if

25  the state court identifies the correct governing legal principle

26  from [the] Court's decisions but unreasonably applies that principle

27  to the facts of the prisoner's case."  Id at 413.

28

**7**

**United States District Court**

For the Northern District of California

1      **"[A] federal habeas court may not issue the writ simply**

2  **because that court concludes in its independent judgment that the**

3  **relevant state-court decision applied clearly established federal**

4  **law erroneously or incorrectly.  Rather, that application must also**

5  **be unreasonable."  Id at 411.  A federal habeas court making the**

6  **"unreasonable application" inquiry should ask whether the state**

7  **court's application of clearly established federal law was**

8  **"objectively unreasonable."  Id at 409.**

9      **The only definitive source of clearly established federal**

10  **law under 28 USC § 2254(d) is in the holdings (as opposed to the**

11  **dicta) of the Supreme Court as of the time of the state court**

12  **decision.  Id at 412; Clark v Murphy, 331 F3d 1062, 1069 (9th Cir**

13  **2003).  While circuit law may be "persuasive authority" for purposes**

14  **of determining whether a state court decision is an unreasonable**

15  **application of Supreme Court precedent, only the Supreme Court's**

16  **holdings are binding on the state courts and only those holdings**

17  **need be "reasonably" applied.  Id.**

18

19                                      **IV**

20      **Petitioner seeks habeas relief under 28 USC § 2254 based**

21  **on three claims:  (1) he was denied due process because the trial**

22  **court excluded testimony from another judge regarding the veracity**

23  **and improper investigative habit of a homicide inspector; (2) he was**

24  **denied due process because the trial court refused to provide the**

25  **jury with special instructions on negligent investigation and the**

26  **relevancy of the circumstances of a confession; and (3) he was**

27  **deprived of effective assistance of counsel because his trial**

28

                                        **8**

counsel failed to request an evidentiary hearing into juror misconduct, failed to redact a tape, and failed to object to hearsay.

**A**

**1**

Petitioner claims that the trial court violated his due process rights when it excluded testimony from another judge regarding the veracity and improper investigative habit of a homicide inspector.

The California Court of Appeal provided the following background for petitioner's claim:

> In his opening statement, defendant referred to an allegation that Inspector Johnson had, in a prior case, lied about the manner in which he conducted a photographic lineup, in front of a superior court judge. The trial court in the present case later learned that Judge James Warren had been subpoenaed to testify for the defense and inquired of defendant as to what the judge would testify to. Ultimately defendant provided the trial court with a copy of taped interviews of Judge Warren. Apparently in a prior murder case, Judge Warren had found that Inspector Johnson had a habit (at least in the two instances before him) of turning off his tape recorder after asking a witness to view a photographic lineup. He believed the two civilian witnesses who testified to that effect. According to defendant, Inspector Johnson had not only turned off the tape recorder, but also had informed the witnesses which individual depicted in the lineup was the defendant in that case.
>
> The trial court found that Judge Warren's testimony was inadmissible under Evidence Code section 352, noting that his testimony was on a collateral matter and that, despite his concerns, Judge Warren had not ruled the evidence of the identifications in his case

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

inadmissible.  The trial court further noted that there was "perhaps a significant dispute about the finding of Judge Warren.  He clearly has not said that Inspector Johnson perjured himself or even lied, and he was asked, directly or indirectly, to give those opinions and he could not bring himself to do that."  The court specifically found that Judge Warren's testimony would be more prejudicial than probative under Evidence Code section 352; the jury should be allowed to judge the credibility of Inspector Johnson without being unduly influenced by the opinion of a judge.  This, the trial court found, was especially true in light of the taped interview of the judge, wherein there was discussion about the judge's grandfather, the late Chief Justice Earl Warren.  As the trial court indicated, "[i]t is clear to me from listening to that tape, Mr. Maas, that you wish to bring before this jury the opinion of James Warren, the grandson of Earl Warren.  And to add to his opinion the specter of the former Chief Jutice of the United States that this Inspector Johnson is a liar.  That, to me, seems to be completely and unduly prejudicial."  The court did permit defendant to introduce evidence as to the alleged police misconduct in the prior case through Inspector Johnson himself, and then if necessary, through the testimony of Mr. Sin and Mr. Jackson, the civilian witnesses in the prior case.

People v Ranjel, slip op at 36-37.

The California Court of Appeal found no abuse of discretion in the trial court's exclusion of Judge Warren's testimony.  The court explained:

[W]hen questioned about his conduct on the prior case, Inspector Johnson admitted that he pointed out the defendant's photograph to witness Jackson after he was unable to identify his assailant.  Thus the inspector's prior conduct in this regard was before the jury, reducing the probative value of the judge's testimony on the subject and rendering it cumulative.  Further, the likelihood of a jury giving undue emphasis to a judge's testimony is undeniable, and here the defense apparently intended to give further weight to his testimony by showing the jury that the judge was the grandson of Earl Warren.

10

**United States District Court**
For the Northern District of California

1
2
3
4

> **Given the collateral nature of the issue, the fact that the inspector admitted to the prior conduct, and the specter of undue emphasis being given to the judge's testimony, we conclude that the trial court's decision that the prejudicial effect of the proffered evidence substantially outweighed any probative value was not an abuse of discretion.**

5

Id at 37-38.

6

7                                    2

8        Generally speaking, the exclusion of evidence that is

9   "highly relevant" to a defense contravenes due process.  See <u>Green v</u>

10  <u>Georgia</u>, 442 US 95, 97 (1979) (finding a due process violation when

11  testimony excluded at trial "was highly relevant to a critical issue

12  in the punishment phase of the trial" regardless of the state's

13  hearsay rule); <u>Chambers v Mississippi</u>, 482 US 284, 302-03 (1973)

14  (holding that exclusion of third-party testimony that was "critical

15  evidence" violated due process).  In deciding whether the exclusion

16  of evidence violates due process, a court balances the following

17  factors:  (1) the probative value of the excluded evidence on the

18  central issue; (2) its reliability; (3) whether it is capable of

19  evaluation by the trier of fact; (4) whether it is the sole evidence

20  on the issue or merely cumulative; and (5) whether it constitutes a

21  major part of the attempted defense.  <u>Chia v Cambra</u>, 360 F3d 997,

22  1004 (9th Cir 2004); <u>Drayden v White</u>, 232 F3d 704, 711 (9th Cir

23  2000).  The court must also give due weight to the state interests

24  underlying the state evidentiary rules on which the exclusion was

25  based.  See <u>Chia</u>, 360 F3d at 1006.

26        Even if the exclusion of evidence amounts to a violation

27  of due process, habeas relief may be granted only if the error had a

28

                                     11

**United States District Court**

For the Northern District of California

1  substantial and injurious effect on the verdict.  See <u>Brecht v</u>

2  <u>Abrahamson</u>, 507 US. 619, 637 (1993).  In other words, the error must

3  have resulted in "actual prejudice."  Id.

4

5                                    3

6        The California Court of Appeal's rejection of petitioner's

7  claim that the trial court violated his due process rights when it

8  excluded Judge Warren's testimony was not contrary to, or involved

9  an unreasonable application of, clearly established Supreme Court

10 precedent, or was based on an unreasonable determination of the

11 facts.  See 28 USC § 2254(d).

12       First, the excluded testimony had little probative value

13 in petitioner's favor.  The jury heard Johnson testify on his

14 previous misconduct in photographic lineup identifications.

15 Johnson's testimony reduced the evidentiary value of Judge Warren's

16 testimony on the same subject.  <u>Chia</u>'s first factor does not weigh

17 in petitioner's favor.  See <u>Chia</u>, 360 F3d at 1004.

18       Second, while the excluded testimony is reliable, there

19 remains "perhaps a significant dispute about the findings of Judge

20 Warren."  Rep Tr at 3077.  The trial court explained:

21            [Judge Warren] has not said that Inspector
             Johnson perjured himself or even lied, and he
22           was asked, directly or indirectly, to give those
             opinions and he could not bring himself to do
23           that.

24            Furthermore, he has not stated * * * the
             standard he used to arrive at his opinions as to
25           Inspector Johnson's conduct.

26            And finally, there appears to be some
             dispute as to the underlying factual pattern
27           that gave rise to Judge Warren's opinion in the

28
                                   12

United States District Court
For the Northern District of California

1   other case.

2   Id.  Chia's second factor does not weigh in petitioner's favor.  See

3   Chia, 360 F3d at 1004.

4        Third, a jury may well give undue emphasis to a judge's

5   testimony, i e, a jury may have difficulty evaluating a judge's

6   testimony given that the jury takes an oath to follow the

7   instructions of a judge.  See Cal Civ Proc Code § 232(b). In the

8   instant case, in his testimony, Judge Warren refers to the fact that

9   he is the grandson of the late Chief Justice Earl Warren, an

10  emphasis that only heightens the emphasis that a jury might place on

11  his testimony.  Chia's third factor does not weigh in petitioner's

12  favor.  See Chia, 360 F3d at 1004.

13       Fourth, as discussed above, the excluded testimony is

14  cumulative in light of Johnson's testimony on the same subject.

15  Chia's fourth factor does not weigh in petitioner's favor.  See id.

16       Finally, the excluded testimony is not a major part of

17  petitioner's case.  At trial, defense counsel indicated that if

18  Johnson testified truthfully, he would probably not call Judge

19  Warren as a witness.  This indicates that counsel did not consider

20  Judge Warren's testimony to be critical to petitioner's case.

21  Chia's fifth factor does not weigh in petitioner's favor.  Id.

22       In light of the totality of the circumstances, the trial

23  court's exclusion of Judge Warren's testimony cannot be said to have

24  amounted to a violation of petitioner's due process rights.  Cf Pool

25  v Dowdle, 834 F2d 777, 780 (9th Cir 1987) (no due process violation

26  to exclude expert testimony where testimony was cumulative and not

27  major part of defense); Miller v Stagner, 757 F2d 988, 994 (9th Cir

28

13

1985) (evidence obtained by police excluded on grounds of misconduct by police does not violate right to present defense of entrapment where not probative of central issue of guilt and activities of police all took place after arrest of petitioner; connection with defense of entrapment too tenuous), <u>amended</u>, 768 F2d 1090 (9th Cir 1985); <u>Perry v Rushen</u>, 713 F2d 1447, 1453 (9th Cir 1983) (no constitutional violation in excluding evidence that another man was seen near scene and that he had history of sexual attacks where identification of petitioner was strong).

Even if the exclusion of Judge Warren's testimony had amounted to constitutional error, petitioner would not be entitled to federal habeas relief because it cannot be said that the "error" had a substantial and injurious effect on the jury's verdict.  See <u>Brecht</u>, 507 US at 637.  The excluded testimony would have had little impact on the jury in light of Johnson's testimony on the same subject, as well as the other substantial evidence presented at trial implicating petitioner in the murder of Carmel Sanger for financial gain.

Petitioner is not entitled to federal habeas relief on his exclusion of evidence claim.  The state court's rejection of the claim cannot be said to be contrary to, or an unreasonable application of, clearly established Supreme Court precedent, or be based on an unreasonable determination of the facts.  See 28 USC § 2254(d).

//

//

//

14

**B**

**1**

Petitioner next claims that he was denied due process because the trial court refused to provide the jury with special instructions on negligent investigation and the relevancy of the circumstances of a confession.

Petitioner proposed the following special or pinpoint instructions regarding the police investigation in this case, all of which the trial court rejected:

> Defendant's Special Jury Instruction No. 1 [¶] If you find that the police inadequately investigated one matter, you may infer that the prosecution also inadequately investigated other matters.  Based on this inference alone you may disbelieve the prosecution witness and evidence. This may be sufficient by itself for you to have a reasonable doubt as to the defendant's guilt; [¶] Defendant's Special Jury Instruction No. 2 [¶] Inadequate or incomplete investigation by the prosecution may support an inference adverse to the prosecution which may be sufficient to leave you with a reasonable doubt as to the defendant's guilt; [¶] Defendant's Special Jury Instruction No. 3 [¶] It is a defense theory that the prosecution's investigation of this case was negligent, and not done in good faith. [¶] Investigation which is thorough and conducted in good faith may be more credible while an[] investigation which is incomplete, negligent, or in bad faith may be found to have lesser value or no[] value at all. [¶] It is for you to decide if the investigation was negligent, and conducted in bad faith, and if so, to give it whatever weight to which you feel it is entitled.

People v Ranjel, slip op 38-39.  The trial court also rejected defendant's request for the following special jury instruction regarding the circumstances under which his confession occurred: "Evidence of the circumstances under which a confession or admission

15

was made is admissible as relevant to its weight and credibility."
Id at 40.  Instead, the court instructed the jury with CALJIC No.
2.70, which states, in part:  "You are the exclusive judges as to
whether the defendant made a confession or an admission, and if so,
whether the or that [sic] statement is true in whole or in part.
Evidence of an oral confession or an oral admission of the defendant
not made in court should be viewed with caution."  Id.

The California Court of Appeal found no error in the trial
court's refusal to grant petitioner's special jury instructions.
Regarding petitioner's requested special instructions on the police
investigation, the court found that

> [w]hile defendant cites general authority for
> the proposition that the thoroughness and good
> faith of a police investigation is relevant, he
> has cited no authority specifically supporting
> the giving of each of these instructions.
> Further, we do not believe any of them
> accurately state the law.  The first requested
> instruction, for example, would tell the jurors
> that if they find the police inadequately
> investigated one matter, they may infer the
> prosecution inadequately investigated other
> matters and that they may, based on that
> inference alone, disbelieve the prosecution
> witnesses and evidence.  The fact that one
> particular investigator may have inadequately
> investigated one particular facet of the case
> (such as the identification of defendant by a
> particular witness), if found to be true by the
> jury, would not necessarily support an inference
> that other particulars were inadequately
> investigated (such as the forensic work in the
> case).  Even if the first inference permitted in
> the instruction were proper, permitting the jury
> to disbelieve all the prosecution witnesses and
> evidence because of such limited inadequate
> police investigation defies logic.  Finally, it
> is improper to instruct the jury that certain
> evidence, such as inadequate police
> investigation, might give rise to reasonable
> doubt.  (*People v. Wright* (1988) 45 Cal.3d 1126,
> 1136 [defendant has a right, under *Sears*, *supra*,

United States District Court

For the Northern District of California

> 2 Cal.3d 180, to a proper instruction that
> pinpoints defendant's theory of the case, but
> not that pinpoints specific evidence that might
> give rise to a reasonable doubt]; see also
> *People v. Garceau* (1993) 6 Cal.4th 140, 192-193
> [court may refuse instruction that directs jury
> to consider specific evidentiary issues in
> determining reasonable doubt where instruction
> argumentative and confusing].)  As proposed,
> defendant's instruction was also argumentative.
> Defendant's other proposed instructions
> regarding the police investigation suffer from
> the same maladies.

People v Ranjel, slip op at 39-40 (footnote omitted).

The court of appeal also found that petitioner's requested special instruction on the circumstances under which his confession occurred was not a pinpoint instruction, nor was it supported by case law.  Id at 40.  Moreover, the court found that because the jury was instructed with CALJIC No. 2.70, petitioner's proposed instruction was repetitious and thus properly rejected.  Id.

2

A state trial court's refusal to give an instruction does not alone raise a ground cognizable in a federal habeas corpus proceeding.  See Dunckhurst v Deeds, 859 F2d 110, 114 (9th Cir 1988).  The omission of an instruction is less likely to be prejudicial than a misstatement of the law.  See Walker v Endell, 850 F2d 470, 475-76 (9th Cir 1987) (citing Henderson v Kibbe, 431 US 145, 155 (1977)).  The error must so infect the trial that the defendant was deprived of the fair trial guaranteed by the Fourteenth Amendment.  See id.  A habeas petitioner whose claim involves a failure to give a particular instruction bears an "'especially heavy burden.'"  Villafuerte v Stewart, 111 F3d 616,

17

**United States District Court**

For the Northern District of California

1   624 (9th Cir 1997) (quoting Henderson, 431 US at 155).

2          An examination of the record is required to see precisely

3   what was given and what was refused and whether the given

4   instructions adequately embodied the defendant's theory.  See United

5   States v Tsinnijinnie, 601 F2d 1035, 1040 (9th Cir 1979).  The

6   defendant is not entitled to have jury instructions raised in his

7   precise terms where the given instructions adequately embody the

8   defense theory.  See United Staes v Del Muro, 87 F3d 1078, 1081 (9th

9   Cir 1996); Tsinnijinnie, 601 F2d at 1040.

10          If constitutional error is found, the court also must find

11   that the error had a substantial and injurious effect or influence

12   in determining the jury's verdict before granting relief in habeas

13   proceedings.  See Calderon v Coleman, 525 US 141, 146-47 (1998)

14   (citing Brecht, 507 US at 637).

15

16                                      3

17          The California Court of Appeal's rejection of petitioner's

18   claim that the trial court violated his due process rights when it

19   rejected his special jury instructions was not contrary to, or

20   involved an unreasonable application of, clearly established Supreme

21   Court precedent, or was based on an unreasonable determination of

22   the facts.  See 28 USC § 2254(d).

23          The state court reasonably determined that there was no

24   legal basis for the requested special instructions on the police

25   investigation or the circumstances surrounding petitioner's

26   confession.  Cf Clark v Brown, 450 F3d 898, 904-05 (9th Cir 2006)

27   (failure to instruct on specific defense theory violation of due

28                                      18

process only if the theory is legally sound and evidence in the case makes it applicable).  Moreover, petitioner's special jury instruction on the circumstances surrounding his confession was repetitive in light of CALJIC No. 3.70.  Because CALJIC No. 3.70 adequately embodied petitioner's defense theory on the circumstances of his confession, petitioner was not entitled to have his instruction given on his precise terms.  See <u>Del Muro</u>, 87 F3d at 1081; <u>Tsinnijinnie</u>, 601 F2d at 1040.

Even if the court's rejection of petitioner's special jury instructions had amounted to constitutional error, it cannot be said that the "error" had a substantial and injurious effect on the jury's verdict.  See <u>Brecht</u>, 507 US at 637.  Nothing in the instructions that were given prohibited the jury from considering evidence regarding the police investigation or petitioner's confession.  To the contrary, by instructing the jury with CALJIC No. 3.70, for instance, the court explicitly advised the jury to take the circumstances surrounding petitioner's confession into consideration.

Petitioner is not entitled to federal habeas relief on his instructional error claim because the California Court of Appeal's rejection of the claim was not contrary to, or involved an unreasonable determination of, clearly established Supreme Court precedent, or involved an unreasonable determination of the facts. See 28 USC § 2254(d).

//

//

//

19

United States District Court

For the Northern District of California

**C**

**1**

Petitioner finally claims that he was denied effective assistance of counsel.  Petitioner argues that counsel was ineffective for:  (1) failing to request an evidentiary hearing to determine whether the twelve participating jurors overheard Alternate Juror No. 5 tell Alternate Juror No. 2 that petitioner was guilty, (2) failing to redact, and (3) failing to oppose hearsay statements.

**2**

To establish ineffective assistance of counsel under Strickland v Washington, 466 US 668, 687-88 (1984), petitioner must establish two things.  First, he must establish that counsel's performance was deficient, i e, that it fell below an "objective standard of reasonableness" under prevailing professional norms. Id.  The relevant inquiry is not what defense counsel could have done, but rather whether the choices made by defense counsel were reasonable.  See Babbitt v Calderon, 151 F3d 1170, 1173 (9th Cir 1998).  Judicial scrutiny of counsel's performance must be highly deferential, and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  See Strickland, 466 US at 689.

Second, petitioner must establish that he was prejudiced by counsel's deficient performance, i e, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id at 694.  A

20

United States District Court

For the Northern District of California

reasonable probability is a probability sufficient to undermine the confidence in the outcome.  Id.

### 3

#### a

Petitioner claims that defense counsel was ineffective for failing to request an evidentiary hearing to determine whether the twelve participating jurors overheard Alternate Juror No. 5 tell Alternate Juror No. 2 that petitioner was guilty.

During a court recess Alternate Juror No. 2 notified the court that Alternate Juror No. 5 had told him "in so many words, that she didn't see why [the trial] was going to go on so long because she already thought [petitioner] was guilty."  Rep Tr at 1934.  The court asked Alternate Juror No. 2 whether this interaction with Alternate Juror No. 5 would "impact" his state of mind.  Id at 1935.  When Alternate Juror No. 2 replied that it would not, the court excused him for the day.  Id.

The court then brought in Alternate Juror No. 5 for questioning.  Id at 1936.  Alternate Juror No. 5 admitted to telling somebody on the panel that she felt the defendant was guilty before hearing all the evidence.  Id.  When asked if she could keep an open mind in the case going forward, Alternate Juror No. 2. replied "I don't know."  Id at 1940.  After some further questioning, the court excused Alternate Juror No. 5 from the panel "for failing to follow the court's instructions and for violating the basic instructions that the court has given."  Id at 1945.

The court did not believe that Alternate Juror No. 2's "ability to proceed as a future juror" was compromised by his

21

1  interaction with Alternate Juror No. 5.  Id at 1946.  Defense

2  counsel and the district attorney agreed with the court on this

3  point.  Id.  The court decided to keep Alternate Juror No. 2 in the

4  panel.  Id at 1946.

5          Petitioner argues that defense counsel should have

6  requested an evidentiary hearing into whether other jurors heard

7  Alternate Juror No. 5 tell Alternate Juror No. 2 that petitioner was

8  guilty.  He claims that counsel's failure to do so amounted to

9  ineffective assistance.  The claim is without merit.

10          In order to show prejudice under Strickland from failure

11  to make a motion, petitioner must show that (1) had his counsel made

12  the motion, it is reasonable that the trial court would have granted

13  it as meritorious; and (2) had the motion been granted, it is

14  reasonable that there would have been an outcome more favorable to

15  him.  Wilson v Henry, 185 F3d 986, 990 (9th Cir 1999).

16          Here, had defense counsel requested an evidentiary

17  hearing, it is not reasonable to believe that the trial court would

18  have granted the request and much less that it would have excused

19  any jurors.  There is no evidence whatsoever that any of the twelve

20  participating jurors heard Alternate Juror No. 5 tell Alternate

21  Juror No. 2 that petitioner was guilty.  Petitioner's claim that the

22  other jurors might have heard this exchange between Alternate Juror

23  Nos. 2 and 5 is entirely speculative.  Defense counsel had no

24  reason to request an evidentiary hearing into this matter.  It

25  simply cannot be said that his failure to request an evidentiary

26  hearing under these circumstances amounted to ineffective

27  assistance.  See id.  Petitioner is not entitled to federal habeas

28

**22**

United States District Court
For the Northern District of California

1    relief on this claim.  See 28 USC § 2254(d).

2

3                                    b

4          Petitioner claims that counsel was ineffective for failing

5    to redact an audiotape and a transcript that referenced a felony

6    that petitioner previously committed.

7          Inspectors Toomey and Johnson interviewed petitioner on

8    December 10, 1997.  Rep Tr at 2905.   During the interview there was

9    a discussion about petitioner's shoplifting arrest at Nordstrom's on

10   January 10, 1997.  Id at 2908.

11         At trial, the district attorney played an audiotape of the

12   interview and also provided the jury with a transcript.  Id at 2905-

13   06. It appears that the jury heard some portion of the tape where

14   the shoplifting incident was being discussed, at which point defense

15   counsel objected on hearsay grounds and moved to strike.  Id at

16   2907.  The court asked the jury to leave their transcripts on their

17   chairs and to proceed to the jury room.  Id at 2908.  Defense

18   counsel requested that the jury be discharged for the rest of the

19   day so he could discuss with petitioner "whether it's in his best

20   interest * * * to move for a mistrial."  Id at 2909-10.  The court

21   found that the reference to petitioner's shoplifting conviction in

22   the audiotape and transcript "probably should have been kept out,"

23   but that "it does not rise to the level of a mistrial, by any

24   standard."  Id at 2911.  When the court asked defense counsel how he

25   would like to proceed, he requested that "all future versions" of

26   the tape and transcript be excised and that the jury be instructed

27   "not to draw any inferences whatsoever" from the shoplifting

28

                                    23

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

references in the transcript and the tape.  Id at 2912.  The court called the jury back and told them to disregard the reference to petitioner's shoplifting arrest in the transcript and the tape.  Id at 2917-18.  The jurors then took a recess, during which the district attorney "cleaned up" the transcript and tape to eliminate any references to the shoplifting incident. Id at 2926-27.

Petitioner claims that defense counsel was ineffective for failing to redact the audiotape and transcript.  He theorizes that the jury found he murdered Carmel Sanger for money because they heard about his shoplifting arrest on the audiotape.  Petitioner's claim is without merit.

It is doubtful that defense counsel was constitutionally deficient because he personally failed to redact the tape and transcript.  Defense counsel submitted that it was the district attorney's "duty" to clean up the tape and transcript, and that the district attorney violated a court order by introducing these two items into evidence without removing any references to petitioner's "alleged shoplifting incident."  Id at 2911-12.  There is no evidence to the contrary.  Regardless, petitioner's claim fails because there is no indication that defense counsel's alleged error prejudiced petitioner in any way.  The trial court judge specifically instructed the jury not to take any reference to petitioner's shoplifting arrest into account when arriving at a decision.  Id at 2917-18.  In light of the judge's admonition and the substantial evidence implicating petitioner in the commission of the murder of Carmel Sanger for financial gain, there is no reasonable probability that, but for counsel's alleged failure to

United States District Court
For the Northern District of California

redact, the result of this proceeding would have been different.
See <u>Strickland</u>, 466 US at 694.  Petitioner is not entitled to
federal habeas relief on this claim.  See 28 USC § 2254(d).

c

Petitioner claims that defense counsel was ineffective for
failing to oppose "the statements of Tannie Tomlin, Amber Tyler, and
Robert Sanger as relayed at trial by Sarah Claxton, Walter Hulit,
Inspector Joseph J. Toomey and the prosecutor" because they "were
testimonial hearsay and were improperly admitted in the declarants'
absence and without prior opportunity for cross examination."  Pet
at 12.  Although <u>Crawford v Washington</u>, 541 US 36 (2004), had not
been decided at the time of his trial, petitioner argues "that is no
excuse for trial counsel failing" to oppose such "testimonial
hearsay" under the Confrontation Clause of the Sixth Amendment.  Id.
Petitioner's claim is without merit.

In <u>Crawford</u>, the Supreme Court held that out-of-court
statements by witnesses that are testimonial hearsay, ie,
testimonial statements offered for the truth of the matter asserted,
are barred under the Confrontation Clause unless (1) the witnesses
are unavailable, and (2) the defendant had a prior opportunity to
cross-examine the witnesses.  <u>Crawford</u>, 541 US at 59.  The
Confrontation Clause does not bar the admission of testimonial
hearsay, or any other hearsay statements, when the declarant appears
for cross-examination at trial.  Id at 59 n9 (citing California v.
Green, 399 US 149, 162 (1970)).

<u>Crawford</u> announced a "new rule" which does not apply

25

retroactively on collateral attack.  Whorton v Bockting, 127 S Ct
1173, 1184 (2007) (applying Teague v Lane, 489 US 288 (1989)).
Because counsel's performance must be evaluated at the time of
petitioner's trial, counsel was not required to anticipate Crawford.
See Lowry v Lewis, 21 F3d 344, 346 (9th Cir 1994); see, eg, Fuller v
United States, 298 F3d 644, 650 n4 (7th Cir 2005) (arguments that
counsel should have anticipated Blakely v Washington, 124 S Ct 2531
(2004), and United States v Booker, 125 S Ct 738 (2005), untenable).

In any event, petitioner's ineffective assistance of
counsel claim fails because there is no reasonable probability that
a motion opposing any of the statements at issue would have been
granted and, much less that, if granted, there would have been an
outcome more favorable to petitioner.  See Wilson, 185 F3d at 990.
Only one of the statements that petitioner cites in his petition -
Inspector's Toomey testimony that "Mr. Tomlin admitted owning the
gun" that petitioner used to kill Carmel Sanger - might be
considered testimonial hearsay.  Rep Tr at 3104-05.  But when Toomey
testified as such, defense counsel objected on hearsay grounds.  See
id at 3105.  The prosecutor responded that the inspector was being
asked to explain his investigation.  The court agreed and admitted
the statement not for the truth of the matter asserted, but "solely
for the purpose to explain why the officer did or did not do certain
things."  Id.  A motion to strike the statement on Confrontation
Clause grounds would have been denied because even if the statement
was testimonial, the Clause "does not bar the use of testimonial
statements for purposes other than establishing the truth of the
matter asserted."  Crawford, 541 US at 60 n9.

United States District Court
For the Northern District of California

1    None of the other statements that petitioner cites in his
2  petition implicated the Confrontation Clause.  For example,
3  petitioner alleges that it was testimonial hearsay when "Sarah
4  Claxton told inspector Jose J. Toomey, that on petitioner's birthday
5  party, she saw Tannie Tomlin."  Pet at 13 (citing Rep Tr at 2596).
6  He also alleges that it was testimonial hearsay when "John Joseph
7  Stuart indicated that he saw Robert Sanger (skull) in the house of
8  petitioner."  Id at 13 (citing Rep Tr at 3111).  The Clause was not
9  violated.  In both instances, the witnesses (Claxton and Stuart,
10  respectively) testified in court and were subjected to cross-
11  examination by defense counsel.  See Crawford, 541 US at 59 n9 (the
12  Confrontation Clause does not bar the admission of testimonial
13  hearsay, or any other hearsay statements, when the declarant appears
14  for cross-examination at trial).  Neither of these two statements,
15  nor any of the others, were testimonial, ie, none of the statements
16  constituted "prior testimony at a preliminary hearing, before a
17  grand jury, or at a former trial" or were the product of "police
18  interrogations."  Id at 68.  Nor were any of the statements
19  hearsay, ie, they were not offered for the truth of the matter
20  asserted.  See id at 51.  Again, there is no reasonable probability
21  that a motion opposing any of these statements would have been
22  granted.  See Wilson, 185 F3d at 990.  Petitioner is not entitled to
23  federal habeas relief on this claim.  See 28 USC § 2254(d).

24  //
25  //
26  //
27
28                              27

V

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.

The clerk shall enter judgment in favor of respondent and close the file.

SO ORDERED.

_____
VAUGHN R WALKER
United States District Chief Judge

28